352 F.Supp.2d 312 (2004)
Knowledge DOWTIN, Petitioner,
v.
Arthur COHEN, Superintendent of Greene Correctional Facility, Respondent.
No. 99-CV-323-SJ, 03-MISC-0066 JBW.
United States District Court, E.D. New York.
August 16, 2004.
*313 *314 *315 *316 Knowledge Dowtin, Gabriels, NY, pro se.
Sholom J. Twersky, District Attorney of Kings County, Brooklyn, NY, for Defendant.

MEMORANDUM, JUDGMENT & ORDER
WEINSTEIN, Senior District Judge.

I. Federal Proceedings

A. Introduction
For the reasons indicated below this petition for a writ of habeas corpus is dismissed with a grant of certificate of appealability.
B. Proceedings in Federal Court
Petitioner filed his petition for writ of habeas corpus on January 15, 1999. After receiving respondent's papers and the state court record, a hearing with petitioner present by telephone was held on June 9, 2003. At petitioner's request, the case was then stayed to permit exhaustion of state remedies.
On the basis of papers to that hearing date, and the hearing, the court issued an opinion dismissing the case and granting a certificate of appealability on the issue of lack of adequate identification. See Order of June 10, 2003. This decision was stayed while petitioner proceeded in state court. See Order of June 13, 2003.
*317 On October 9, 2003 the stay was lifted. Petitioner was given leave to amend his petition. On October 23, 2003 petitioner informed the court that he wished to continue exhausting his claims in state court. The stay was reimposed on November 20, 2003 at petitioner's request.
By letter dated January 19, 2004 petitioner requested the reopening of the case in this court. The case was reopened by order of February 2, 2004, with amendments to the petition allowed. No hearing was required by the court.
A motion pursuant to 28 U.S.C. section 2251 was made by petitioner on March 8, 2004. Simultaneously an amended petition was filed to stay the state court judgment.
On May 12, 2004 the court held another hearing. See the 74 page transcript of that date. Petitioner appeared by telephone, pro se. Petitioner's trial counsel, Eric Maggett, testified and was cross-examined by petitioner at the May 12 hearing. The court found counsel's testimony credible. The court decided orally to dismiss the petition, but gave the parties leave to submit further papers after the May 12 hearing. See Transcript May of 12, 2004, pp 69-73. See Order of May 12, 2004.
A consolidated response was submitted on June 8, 2004. On June 28 petitioner submitted a "traverse". The final date for any further submissions by petitioner was set by the court at July 13, 2004.
No further papers having been received from either party, the case is now, on July 26, 2004 ready for decision. The court is satisfied that petitioner has been given a fair and full opportunity to make his case in the state and federal courts.
C. Contentions of Petitioner
Petitioner's original claims were that (1) his statements to the police were involuntary, (2) there was a violation of his Miranda rights, and (3) there was an eyewitness identification problem. Transcript May 12, 2004, p 3. Upon return from the state court petitioner added the following claims: 1) suggestive identification procedures by the police; 2) deprivation of the right to trial counsel; 3) deprivation of the right to call witnesses and to cross-examination adverse witnesses; 4) ineffective trial counsel representation; 5) use of impermissible hearsay; and 6) use of perjured testimony by the prosecution.
D. State Proceedings
The evidence and records in the case support the following statements.
On November 10, 1994, at approximately 2:30 p.m., petitioner (sometimes referred to as "defendant") approached Arthur Cohen at the entrance to Cohen's mattress store located at 424 Remsen Avenue in Brooklyn. Defendant confronted Cohen and said: "This is a holdup." When Cohen attempted to resist, defendant shot him twice in the leg at close range. After Cohen fell to the ground, defendant leaned over and searched the victim's pockets. Defendant then shot Cohen three more times in the groin and abdomen area.
Defendant was charged under Kings County Indictment Number 273/95 with one count of Attempted Murder in the Second Degree (New York Penal Law §§ 110.00/125.25[1]), two counts of Assault in the First Degree (New York Penal Law §§ 110.00/160.15[1], [2], [3]), one count of Attempted Robbery in the Second Degree (New York Penal Law §§ 110.00/160.10[2][a]), one count of Criminal Possession of a Weapon in the Second Degree (New York Penal Law § 265.03), and one count of Criminal Possession of a Weapon in the Third Degree (New York Penal Law § 265.02[4]).
Prior to trial, defendant moved to suppress the identification made by two witnesses at the lineup, as well as defendant's *318 signed statement and videotaped statement. After conducting an evidentiary suppression hearing, the court found both of defendant's statements as well as the identification evidence admissible at trial.
Defendant was convicted, after a jury trial, of one count each of Assault in the First Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. He was sentenced to concurrent terms of imprisonment of five to fifteen years' imprisonment on the first-degree assault and second-degree possession convictions, and to a concurrent term of two and one-third to seven years' imprisonment on the third-degree possession conviction.
On his state appeal, defendant claimed: (a) defendant's identity as the shooter was not proven beyond a reasonable doubt; (b) defendant's statements should have been suppressed because they were in violation of his right to due process; and (c) defendant's sentence was excessive.
On November 24, 1997, the Appellate Division, Second Department, unanimously affirmed defendant's conviction. People v. Dowtin, 244 A.D.2d 567, 664 N.Y.S.2d 363 (2d Dep't 1997). The state appellate court held that defendant's legal sufficiency claim was both unpreserved as a matter of law and meritless. That court also determined that
there is no merit to the defendant's contention that his statements were involuntary. It is undisputed that the defendant was not threatened, abused, or otherwise mistreated by the police .... There is no evidence that the defendant requested an attorney at the time, that he was deprived of food or drink, or that he was subjected to persistent and overbearing interrogation or deception so fundamentally unfair as to deny due process .... Additionally, the hearing court found that the defendant had twice been advised of his Miranda rights and had voluntarily waived them prior to making both his oral and videotaped statements ....
Id. at 567-68, 664 N.Y.S.2d 363 (citations omitted). The state court also found defendant's sentencing claim meritless.
In a letter, dated January 8, 1998, defendant's sought leave to appeal to the New York Court of Appeals. On February 13, 1998, this application was denied. People v. Dowtin, 91 N.Y.2d 925, 670 N.Y.S.2d 406, 693 N.E.2d 753.
On June 5, 2003, while defendant's original habeas application was pending before this court, petitioner moved pro se to vacate judgment in New York Supreme Court, Kings County. In that motion, defendant alleged that: (a) the court improperly denied him the right to call as a defense witness the victim of another crime which had occurred at about the same time and location as the instant case; (b) the court improperly allowed the People's eyewitness to testify regarding his out-of-court identifications as well as the bolstering testimony of the arresting officer; (c) defendant's arrest photo was improperly used at trial; and (d) defendant received ineffective assistance of trial counsel when counsel failed to offer objections to these errors, failed to preserve defendant's legal insufficiency claim for appellate review, and failed to object to the court's refusal to provide the jury with certain witnesses' grand jury testimony pursuant to the jurors' request.
In a supplemental pro se motion to vacate judgment, dated June 30, 2003, defendant raised several new claims, in Supreme Court, Kings County, including that: (a) the hearing court improperly denied defendant's motion to suppress the identification evidence; (b) the court improperly precluded defendant from cross-examining the victim regarding his prior *319 alleged statement that he had recognized the shooter as someone who had robbed him in 1992 or 1993; (c) that defendant received ineffective assistance of trial counsel when counsel: (i) failed, as per defendant's request, to investigate the time it would have taken the witness Pascal Kelly to ride to the auto body store to hear the shooting, (ii) failed to obtain a surveillance tape from the Burger King which allegedly would have demonstrated that defendant's hairstyle and clothing did not match the witnesses' description of the shooter, and (iii) failed to call defendant's brother and a friend as alibi witnesses at trial; (d) the trial court improperly denied defendant's written motion to have new counsel assigned; (e) the People knowingly proffered false testimony regarding Pascal Kelly attending some of the same classes as defendant; and (h) the court should have held a hearing on Pascal Kelly's prior familiarity with defendant.
On July 28, 2003, the Supreme Court, Kings County, in a written decision, summarily denied defendant's motion to vacate judgment. The state court held that most of defendant's claims were statutorily precluded from review, pursuant to New York Criminal Procedure Law section 440.12(2)(c), because defendant failed to raise the issues on direct appeal. The court alternatively found that any of the procedurally barred claims that related to defendant's ineffective assistance of counsel claim were meritless.
In an application, dated August 18, 2003, defendant moved for leave to appeal the denial of his motion to vacate judgment. On January 5, 2004, the Appellate Division denied the application.
II. AEDPA
Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).
An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." Sellan v. Kuhlman, 261 F.3d 303, 313 (2d Cir.2001) (quoting Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S.Ct. 1495. "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." Overton v. Newton, 295 F.3d 270, 278 (2d Cir.2002). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).
*320 III. Limitations Period
Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. See 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Id. § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. See McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir.2003); see also Sup.Ct. R. 13.
Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. See Ross v. Artuz, 150 F.3d 97, 103 (2d Cir.1998).
"[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." Acosta v. Artuz, 221 F.3d 117, 121 (2d Cir.2000). "If the court chooses to raise sua sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." Id.
In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted ...." 28 U.S.C. § 2244(d)(2). The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. Adeline v. Stinson, 206 F.3d 249, 253 (2d Cir.2000); see also Artuz v. Bennett, 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000) ("[A]n application is `properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.... The question whether an application has been `properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).
The term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. See Bennett v. Artuz, 199 F.3d 116, 120 (2d Cir.1999), aff'd, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). "[A] state-court petition is `pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." Bennett, 199 F.3d at 120; Carey v. Saffold, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. See Bethea v. Girdich, 293 F.3d 577, 579 (2d Cir.2002).
The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. See Muniz v. United States, 236 F.3d 122, 128 (2d Cir.2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits and not barred procedurally" (quotation omitted)); Rodriguez v. *321 Artuz, 990 F.Supp. 275, 283 (S.D.N.Y.1998) (AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ).
A pro se litigant is accorded "some degree of latitude" in meeting filing requirements. Brown v. Superintendent, 1998 U.S. Dist. LEXIS 1936, No. 97 Civ. 3303, 1998 WL 75686, at *4 (S.D.N.Y. Feb.23, 1998). But "[it] has long been recognized that ignorance does not excuse lack of compliance with the law." Velasquez v. United States, 4 F.Supp.2d 331, 334-35 (S.D.N.Y.1998) (holding that Bureau of Prison's failure to notify prisoners regarding AEDPA's time limitation did not warrant acceptance of untimely petition); see also Brown, 1998 WL 75686 at *4 ("self-serving statement that the litigant is ignorant of the law is not grounds for equitable tolling of a statute of limitations").
The Supreme Court held in Duncan v. Walker that "an application for federal habeas corpus review is not an `application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)," and that therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." 533 U.S. 167, 181-82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). Duncan reversed a case in this circuit which held to the contrary. See Walker v. Artuz, 208 F.3d 357, 361-62 (2000). Although the Supreme Court has now declared that AEDPA's one-year limitations period is not tolled during the pendency of a properly filed federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir.2000).
"Equitable tolling ... is only appropriate in `rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with `reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances `beyond his control' prevented successful filing during that time." Smaldone v. Senkowski, 273 F.3d 133, 138 (2d Cir.2001). Although state prisoners are not entitled to counsel as of right in either New York state collateral or federal habeas corpus proceedings, the Court of Appeals for the Second Circuit has stated that "an attorney's conduct, if it is sufficiently egregious, may constitute the sort of `extraordinary circumstances' that would justify the application of equitable tolling to the one-year limitations period of AEDPA." Baldayaque v. United States, 338 F.3d 145, 153 (2d Cir.2003); compare Smaldone, 273 F.3d at 138-39 (attorney calculation error does not justify equitable tolling).
Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine by arguing that a new petition should be treated as having been filed on the same day as a first petition. As the court of appeals has explained,
If [the limitations period] were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.
Warren v. Garvin, 219 F.3d 111, 114 (2d Cir.2000) (quoting Graham v. Johnson, 168 F.3d 762, 780 (5th Cir.1999)).
IV. Exhaustion
In the past, a state prisoner's federal habeas petition had to be dismissed if the *322 prisoner did not exhaust available state remedies as to any of his federal claims. See Rose v. Lundy, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir.1982) (en banc).
Pursuant to AEDPA, a district court may now, in its discretion, deny on the merits habeas petitions containing unexhausted claims  so-called "mixed petitions." See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." Id. § 2254(b)(3); see also Ramos v. Keane, No. 98 CIV. 1604, 2000 WL 12142, *3-4, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).
V. Procedural Bar
A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750, 111 S.Ct. 2546.
If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).
When a state court "says that a claim is `not preserved for appellate review' and then ruled `in any event' on the merits, such a claim is not preserved." Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir.1996). When a state court "uses language such as `the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review.' Fama v. Comm'r of Corr. Svcs., 235 F.3d 804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." Su v. Filion, 335 F.3d 119, 126, n. 3 (2d Cir.2003) (citing Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." Id.
*323 VI. Actual Innocence
"[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, i.e., that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 729 (2d Cir.2002).
Because habeas corpus "is, at its core, an equitable remedy," Schlup v. Delo, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court has stated that "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," id. at 320-21, 115 S.Ct. 851 (quotations omitted). To ensure that this exception remains rare and will be applied only in the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. Id. at 321, 115 S.Ct. 851. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id. at 324, 115 S.Ct. 851.
A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim. See Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned "`not [with] the petitioners' innocence or guilt but solely [with] the question whether their constitutional rights have been preserved.'" Id. (quoting Moore v. Dempsey, 261 U.S. 86, 87-88, 43 S.Ct. 265, 67 L.Ed. 543 (1923)); cf. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (habeas court may review an independent constitutional claim that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt); Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of "Shuffling Sam" on direct review from conviction in Louisville's police court where there was no evidence that defendant violated city ordinances).
VII. Ineffective Assistance of Counsel
The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose  "to ensure a fair trial"  and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undetermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," id. at 688, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been *324 different," id. at 694, 104 S.Ct. 2052. See also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2530-32, 156 L.Ed.2d 471 (2003); United States v. Eyman, 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." Lindstadt v. Keane, 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Purdy v. Zeldes, 337 F.3d 253, 260 (2d Cir.2003) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. See Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir.2003).
As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691, 104 S.Ct. 2052. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under Strickland's prejudice prong. See Pavel v. Hollins, 261 F.3d 210, 223 (2d Cir.2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); Lindstadt, 239 F.3d at 201 (same). The court of appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy  a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. See Eze, 321 F.3d 110, 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").
There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. See Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to *325 the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. Caballero v. Keane, 42 F.3d 738, 741 (2d Cir.1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. See Word v. Lord, No. 00 CIV. 5510, 2002 WL 32145769, **11-12, 2002 U.S. Dist. LEXIS 19923, at *34-*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).
Although the Strickland test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. See Claudio v. Scully, 982 F.2d 798, 803 (2d Cir.1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance." Id. (quotations omitted).
VIII. Errors of State Law
Federal habeas corpus relief does not lie for mere errors of state law. Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with `that fundamental fairness' which is `essential to the very concept of justice.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir.1998) (quoting Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a "`substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation omitted).
IX. Evidentiary Error
For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been `crucial, critical, highly significant.'" Collins v. Scully, 755 F.2d 16, 19 (2d Cir.1985) (quoting Nettles v. Wainwright, 677 F.2d 410, 414-15 (5th Cir. 1982)). This test applies post-AEDPA. See Wade v. Mantello, 333 F.3d 51, 59 (2d Cir.2003).
X. Verdict Against the Weight of the Evidence
To the degree petitioner claims that his guilt was not proven beyond a *326 reasonable doubt, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. Einaugler v. Supreme Court, 109 F.3d 836, 840 (2d Cir.1997). To the degree petitioner claims the verdict was against the weight of the evidence, such a claim does not present a federal constitutional issue.
XI. Legal Claims Frequently Raised in Habeas Corpus Applications
For an explication of the law concerning other claims that are frequently raised before this court in applications for a writ of habeas corpus, see Waters v. McGuiness, 99-CV-0615, 03-MISC-0066 (JBW), 2003 WL 21508318, **2-3, 2003 U.S. Dist. LEXIS 11077, at *4-*5 (E.D.N.Y. June 16, 2003) (grand jury claims); Custodio v. Duncans, 269 F.Supp.2d 40, 42-43 (E.D.N.Y.2003) (Batson challenges); Reyes v. Irwin, 273 F.Supp.2d 205, 207-08 (E.D.N.Y.2003) (Wade claims); Brathwaite v. Duncan, 271 F.Supp.2d 400, 401-02 (E.D.N.Y.2003) (Sandoval claims); Thomas v. Kuhlman, 255 F.Supp.2d 99, 108-09 (E.D.N.Y.2003) (perjured testimony); Martinez v. Greiner, 99-CV-4663, 03-MISC-0066 (JBW), 2003 WL 21508322, *2, 2003 U.S. Dist. LEXIS 11046, at *7 (E.D.N.Y. June 20, 2003) (Fourth Amendment claims); Plunkett v. Keane, 269 F.Supp.2d 31, 34-35 (E.D.N.Y.2003) (Rosario claims); Beniquez v. Bennett, 00-CV-0985, 03-MISC-0066 (JBW), 2003 WL 21508329, **5-6, 2003 U.S. Dist. LEXIS 11032, at *15-*16 (E.D.N.Y. June 16, 2003) (prosecutorial misconduct); Cox v. Donnelly, 267 F.Supp.2d 418, 423-24 (E.D.N.Y. 2003) (shifting burden of proof); Jelinek v. Costello, 247 F.Supp.2d 212, 266-67 (E.D.N.Y.2003) (right to self-representation); Stewart v. Senkowski, 00-CV-0806, 03-MISC-0066 (JBW), 2003 WL 21508320, **2-3, 2003 U.S. Dist. LEXIS 11028, at *6 (E.D.N.Y. June 16, 2003) (erroneous jury instructions); Jenkins v. Artuz, 98-CV-7837, 00-MISC-0066 (JBW), 2003 WL 21499889, **2-3, 2003 U.S. Dist. LEXIS 11049, at *7-*8 (E.D.N.Y. June 13, 2003) (abuse of discretion in sentencing);
XII. Harmless Error
In order to be entitled to habeas relief, a petitioner must ordinarily demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," and that the error resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation marks omitted).
When a claim was never adjudicated on the merits in the state courts and there is no ruling which commands AEDPA deference, it is unclear what the standard for review for harmlessness should be in a collateral attack when a federal court finds constitutional error. Should it proceed under the "beyond a reasonable doubt" standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (conviction infected by constitutional error must be overturned unless "harmless beyond a reasonable doubt") or under the "substantial and injurious effect or influence" standard of Brecht (for cases on collateral review, an error is generally considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict")? The correct standard of review is an open question in this circuit. See Cotto v. Herbert, 331 F.3d 217, 252-53 (2d Cir.).
*327 XIII. Certificate of Appealability
This opinion complies with Miranda v. Bennett, 322 F.3d 171, 175-77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. See Sumner v. Mata, 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").
A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253; Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." See also Shabazz v. Artuz, 336 F.3d 154, 160 (2d Cir. 2003).
XIV. Analysis of Claims

A.
After a full evidentiary hearing, the state court determined that defendant's two statements had been voluntarily given, a decision that was affirmed by the state appellate court. See People v. Dowtin, 244 A.D.2d 567, 664 N.Y.S.2d 363 (2nd Dep't 1997). In considering defendant's challenge to that ruling, this court must defer to the state court's subsidiary factual findings if fairly supported by the record. See 28 U.S.C.A. § 2254(d). It should give great weight to the considered conclusions of the state court. See Culombe v. Connecticut, 367 U.S. 568, 605, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Nevertheless, the ultimate issue of voluntariness is a legal one, subject to this Court's independent factual review. See Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).
The state record demonstrates that the prosecution proved by at least a preponderance of the evidence that, under the totality of the circumstances, defendant's statements were given voluntarily. See U.S. v. Kaba, 999 F.2d 47, 50 (2d Cir.), cert. denied 510 U.S. 1003, 114 S.Ct. 577, 126 L.Ed.2d 476 (1993) (totality of circumstances includes defendant's background and experience, condition of interrogation, and conduct of law enforcement officers); Arizona v. Fulminante, 499 U.S. 279, 282-89, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Green v. Scully, 850 F.2d 894, 901 (2d Cir.), cert. denied, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). There was nothing about the state court's determination that was either contrary to or an unreasonable application of well established Supreme Court law. See 28 U.S.C. § 2254(d).
In determining that defendant's statements were voluntarily made, the state suppression court found that defendant had been properly advised of his Miranda rights before he made both his signed and videotaped statements (Suppression Minutes at 70). Having viewed the videotape, the hearing court also found that there was "no indication, no evidence whatsoever that defendant was coerced into making a statement" (Suppression Minutes at 70). The state court further concluded that the amount of time in custody without eating, prior to the statements, was "not sufficient to vacate or vitiate the statements made" (Suppression Minutes at 69-70).
*328 The hearing record completes supports the state court's findings. Approximately eight hours after arrest, during which time the line-up procedures were held, defendant agreed that "he would indeed want" to tell his side of the story (Suppression Minutes at 18). He then provided an oral statement and signed a written one after being Mirandized (Suppression Minutes at 20, 55-57). A few hours later, defendant agreed to repeat his statement to an assistant district attorney on videotape after waiving his Miranda rights a second time (Suppression Minutes at 25).
During his time in custody, the police gave defendant the opportunity to make "any and all phone calls that he wished" (Suppression Minutes at 40, 60-61). The police placed no restrictions upon how many calls defendant could make, whom he could call, and for how long he could remain on the phone. Although the police gave defendant no reason to believe that he would be denied the right to speak to his mother, who was fully aware of defendant's arrest, defendant, instead, chose to call a friend (Suppression Minutes at 39-40, 51, 60-61). There is no evidence that his mother asked to see him.
The court also never gave defendant any reason to believe that he would be denied food if requested. Defendant was not too frightened to ask the police for a drink and to use the bathroom, both requests which were granted (Id. at 22-23, 39-40, 60-61). While defendant was only sixteen-years-old at the time, there was no evidence from the state hearing record that the police employed any trickery or deceit or intentionally isolated defendant from his family or friends. Cf. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (fourteen-year-old boy kept in custody away from mother for week). The state determination that statements were voluntary is not now challengeable.
Even if the hearing court's decision was improper, any alleged error was harmless considering the fact that the People never introduced defendant's statements into evidence on their direct case at trial, but only utilized a portion of defendant's videotaped statement on cross-examination to impeach defendant's testimony on a relatively insignificant matter (see Trial Minutes at 264).
This claim is without merit.

B.
This court is barred from reviewing defendant's claim that his identity was not proven at trial by legally sufficient evidence. On his direct state appeal, defendant contended that his identity had not been proven beyond a reasonable doubt. In respondent's state appellate brief, respondent had argued that defendant had failed to preserve this claim as a matter of law. Specifically, the state claimed that in defendant's motions to dismiss at trial, defendant never specified that he was contesting the alleged insufficiency of the identification evidence.
New York's contemporaneous objection rule, codified in N.Y. Criminal Procedure Law § 470.05(2), requires both that an objection be lodged at the time of the ruling or "at any subsequent time when the court had an opportunity of effectively changing the same .... [and] is sufficient if the party made his position with respect to the ruling or instruction known to the court." New York Criminal Procedure Law § 470.05(2). Under state law, timeliness as well as specificity are required for the preservation of claims of error. See People v. Bynum, 70 N.Y.2d 858, 859, 523 N.Y.S.2d 492, 492, 518 N.E.2d 4 (1987) (general motion to dismiss at close of evidence insufficient to preserve claim regarding establishment of particular element of crime); People v. Golden, 236 A.D.2d 486, 655 N.Y.S.2d 959 (2d Dep't *329 1997); People v. Caballero, 177 A.D.2d 496, 575 N.Y.S.2d 710 (2d Dep't 1991) (in both cases, state appellate court held defendant's specific claim that People failed to prove identity unpreserved as a matter of law).
In its decision, the Appellate Division, in reliance on N.Y. Criminal Procedure Law § 470.05(2), held that defendant had similarly failed to preserve his legal sufficiency claim for appellate review. People v. Dowtin, 244 A.D.2d at 567, 664 N.Y.S.2d at 363. The state appellate court offered a "plain statement," Harris v. Reed, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), that its decision, at least, in part, relied on the state procedural rule. Because defendant had offered no cause for his procedural default nor shown prejudice from it, this court is precluded from reviewing this claim on an independent and adequate state procedural ground. See Teague v. Lane, 489 U.S. 288, 295-96, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); Reed v. Ross, 468 U.S. 1, 11, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); Engle v. Issac, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).
The fact that the state appellate court also determined that defendant's identity as the shooter was proven beyond a reasonable doubt, does not remove the federal procedural bar to review. See Harris v. Reed, 109 S.Ct. at 1044 n. 10 ("a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine required the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law"); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir.1990).
Even if this Court should choose to review defendant's claim, defendant's contention is meritless. In reviewing a petition for habeas corpus, where a petitioner claims that his guilt was not proven beyond a reasonable doubt, a federal court must determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). New York has incorporated that same standard of review on appeal. People v. Contes, 60 N.Y.2d 620, 621, 467 N.Y.S.2d 349, 454 N.E.2d 932 (1983). The evidence presented in the case at bar meets this standard and fully supports the state court's determination that defendant's identification as the perpetrator was sufficiently established.
The state trial record provides overwhelming evidence establishing defendant's identity beyond a reasonable doubt. The People's most important identification evidence came from the testimony of Rodrique Kelly, who witnessed defendant shoot Arthur Cohen, followed defendant as he fled, and thereafter identified defendant on three separate occasions as the shooter. According to Rodrique's testimony, on the afternoon of November 17, 1994, Kelly was backing his car out of his auto body shop driveway located two doors down from Mr. Cohen's mattress shop entrance on Remsen Avenue (Trial Minutes at 53, 55, 71). As he backed out, Rodrique looked to his right and saw defendant and two other men standing close to Mr. Cohen outside the mattress store (Trial Minutes at 55-56, 60-74, 92). Nothing blocked Rodrique's view of the three men (Trial Minutes at 59). From that vantage point, Rodrique was able to recognize the victim, whom he knew in the community (Trial Minutes at 53-55, 59).
*330 After seeing the three men, Rodrique began to look the other direction, heard a loud noise and saw a flash, and looked back in the direction of the mattress store (Trial Minutes at 56-59). Rodrique then saw defendant shoot Mr. Cohen and go through his pockets a the victim lay on his back on the sidewalk (Trial Minutes at 56-59). At one point, during the shooting, defendant looked up and straight in the direction of Rodrique, giving Rodrique a "very good opportunity" to see defendant's face (Trial Minutes at 77). At trial, Rodrique described height of five foot seven or eight inches, skinny, with a long face, and clothed in a green three-quarters jacket and a baseball cap (Trial Minutes at 59-60, 64, 70). Rodrique also described defendant's companion as young, skinny, and wearing a gray jacket (Trial Minutes at 57, 60, 64, 70-71, 75-76).
According to Rodrique, defendant's companion in the grey jacket then ran in one direction while defendant put the gun in his waistband and ran southeast on Remsen towards Church Avenue (Trial Minutes at 63, 83). Rodrique immediately backed his car out, made a quick U-turn and began to follow defendant (Trial Minutes at 62, 64). As defendant ran, his baseball cap fell off, and Rodrique saw that the top back portion of defendant's hair was "sticking up, like, braided" but that the sides were "clean cut" (Trial Minutes at 60, 63).
Rodrique followed as defendant ran to a men's ten-speed bicycle leaning against a fence on Remsen Avenue, picked it up and rode it towards Church Avenue (Trial Minutes at 62, 85, 91). Rodrique continued to follow defendant as he turned left on Church Avenue and continued to the intersection of Eat 93rd Street and Church (Trial Minutes at 63-66, 85). At the intersection, Rodrique observed defendant from across the street, about thirty-seven feet away, as defendant stopped, leaned forward on his bike to lift his closed green three-quarters jacket, and pulled a gun from his front waistband (Trial Minutes at 62-63, 86-87). Defendant looked around and behind him, giving Rodrique another opportunity to view defendant from various angles, replaced the gun in his waistband, and turned left on East 93rd before defendant entered the building at 1092 Willmohr Street (Trial Minutes at 63-66, 86-87, 89).
Pascal Kelly also provided evidence identifying defendant as the shooter and corroborating significant portions of his father's account. Pascal had known defendant for about a year and a half prior to the shooting, because the two attended South Shore High School and took two classes together (P. Kelly: 108-09, 142). At school, Pascal saw defendant almost every day (P. Kelly: 109-11, 128). Even defendant, when he testified, corroborated the fact that he had seen Pascal "around," probably at school (Trial Minutes at 235, 274; see F.H. 19). In addition, Pascal saw defendant at the Burger King, located down the block and on the same side of Remsen as Mr. Cohen's mattress store (Trial Minutes at 112, 128). Every time Pascal saw him, defendant wore his hair shaved closely around the sides and back but with a section of breads braided on the top and at the back of his head (Trial Minutes at 111-12, 129).
Earlier in the afternoon of November 10, 1994, prior to the shooting, Pascal saw and recognized defendant after school at the Burger King at Church and Remsen (Trial Minutes at 115). At the time, Pascal similarly noted that defendant wore a green jacket hanging down to mid-thigh and a black hat and that defendant's companion wore a gray or black jacket (Trial Minutes at 114-14, 120, 128). Pascal saw defendant and his companion from where he stood, about three feet away, in the *331 Burger King (Trial Minutes at 113-14, 128).
About thirty minutes later, Pascal was in his father's shop when he heard five gunshots (Trial Minutes at 117, 139). He saw defendant's co-perpetrator in a gray jacket, whom he had seen earlier with defendant at the Burger King, running by him (Trial Minutes at 121-22, 135). Pascal left the shop and saw his father in a car following defendant (Trial Minutes at 118, 120). Pascal mounted his bicycle and followed his father and defendant from about fifty feet behind (Trial Minutes at 118-20, 147). Pascal recognized the man his father was pursuing as defendant, recognizing him from his back, from the clothes he wore, the shape of his head, and from his distinctive hairstyle (Trial Minutes at 133, 145, 150).
Although Pascal was not certain whether defendant was still wearing the cap he had worn earlier, this is consistent with Rodrique's testimony that defendant wore a hat, which fell off while he was running to his bicycle and was never replaced (Trial Minutes at 60, 63). Because Pascal was in a position to observe the back of defendant's head and his hair as defendant rode his bicycle, this testimony supports Rodrique's identification of defendant as the person fleeing by bicycle. After the pursuit, Pascal specifically informed Rodrique that his father had been chasing "Knowledge" (Trial Minutes at 122).
Both Rodrique and Pascal positively identified defendant on numerous occasions. Seven days after the attack, Rodrique viewed the photo array and identified "mostly" photo number two, defendant, as the likely perpetrator because of "the way ... their face looks," the long shape of the face, and because of "the profile" (Trial Minutes at 78-79, 92, 93, 95, 223, 226). Rodrique stated that although identifying the perpetrator by a photograph was somewhat harder, he would "definitely" know if he saw him in person (Trial Minutes at 92-93, 224-26).
Seven weeks later, Rodrique and Pascal both positively identified defendant in separate line-ups. Rodrique viewed the line-up for a "few seconds" and "[i]nstantly ... noticed the gentleman that did the shooting" as number two, defendant, recognizing his face (Trial Minutes at 67-69, 73, 80, 96). When he observed defendant, Rodrique stated, "Yes, that's the guy. He kept shooting at him" (Trial Minutes at 69). Pascal viewed the lineup person whom he saw his father following after the shooting (Trial Minutes at 126, 142). Thereafter, eight months after the shooting, Rodrique and Pascal both identified defendant in the courtroom as the person who attempted to rob and then shot Mr. Cohen five times (Trial Minutes at 60-61, 110).
Contrary claims by defendant ultimately amount to no more that a re-examination of issues of credibility which were properly and rationally resolved by the jury. This is especially true given that the trial court explicitly charged the jury on the issue of identification (Trial Minutes at 361-63).
The victim, Mr. Cohen, was unable to make a positive identification. His testimony corroborates identification of defendant as the shooter. Mr. Cohen described the shooter as a black man wearing a green jacket (Trial Minutes at 45-46, 51). Mr. Cohen, who stands five foot nine or ten, described the shooter as slightly shorter then himself and of slight build (Trial Minutes at 29, 45-46, 51). This testimony is consistent with the testimony of other witnesses and their description of defendant as the shooter.
There is some evidence that the shooter may have been someone else. The issue was one for the jury.
This claim is without merit.

*332 C.
Defendant's identification claim regarding the suggestiveness of the pre-trial identification procedures are arguably precluded from habeas review on an independent and adequate state procedural ground. In denying this claim in defendant's motion to vacate judgment, the state court explicitly held, pursuant to N.Y. Criminal Procedure Law § 440.10(2)(c), that "[t]he issues raised herein, could have been raised on direct appeal but were unjustifiably not raised. Accordingly, the motion is procedurally barred, and the sought for relief is denied for reasons of procedural default." July 28, 2003, Decision at 3. Because the state court's decision denying this particular claim was based on a well-established state procedural default, and defendant has failed to show any cause and prejudice or a fundamental miscarriage of justice attendant to these claimed errors, this claim is arguably precluded from review by this court. See Coleman v. Thompson, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Epps v. Commissioner, 13 F.3d 615 (2d Cir.), cert. denied, 511 U.S. 1023, 114 S.Ct. 1409, 128 L.Ed.2d 81 (1994). Defendant never raised a claim of ineffective assistance of appellate counsel in state court.
Arguably, all of the specific factual grounds underlying this claim remain unexhausted in the state court. Defendant alleges in his current petition that the initial photographic identification procedure involving witness Rodrique Kelly was impermissibly suggestive because: 1) defendant's photo had prison numbers across his chest; 2) defendant was the only individual that possessed the same distinctive hairstyle that Rodrique had described; 3) after choosing a different photo Rodrique additionally selected defendant's photo solely as a result of the police officer's influence; and 4) a photographic procedure had been unnecessary sine a lineup could have been conducted (see Amendment of Petition at A-1 to A-2).
As for the lineup procedure, defendant argues that it was also impermissibly suggestive because he was the only participant who had also appeared in the photo array, after Rodrique Kelly had been unsure of his original selection, and defendant was the only participant in the lineup who, again, matched the hairstyle description Rodrique had provided (see Amendment of Petition at A-2 to A-3).
At the close of the state suppression hearing defendant's only contention regarding the photo array was that because Rodrique had been somewhat uncertain between photo number one and number two, defendant's photo, the police should have investigated the individual pictured in photo number one as well (see Suppression Minutes at 63-64). Defendant's claims regarding the lineup solely involved that the lineup photos were of poor quality, the police had failed to note the height and weight of the lineup participants, and that the lineup was unfair because the fillers appeared significantly older than defendant and, at least, one of the fillers was substantially broader (see Id. at 61-63).
Arguably, defendant failed to fairly present, as part of his suggestiveness claim in state court, any of the particular factual allegations that he raises now in support of this claim. Accordingly, these specific allegations arguably remain unexhausted. "A petitioner has "fairly presented" his claim [on federal habeas review] only if he has `informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997) (quoting Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir.1982)) (en banc). Here, defendant arguably failed to raise to the state hearing court any of the particular allegations that he raises now in support *333 of the claim the Rodrique Kelly's lineup identification should have been suppressed. Because, as with his general claim of suggestiveness, defendant can no longer raise these on direct appeal, these claims are arguably precluded from federal review on this independent ground. See Grey v. Hoke, 933 F.2d at 120-21.
A due process challenge to the admissibility of identification evidence requires a two-step determination. United States v. Wong, 40 F.3d 1347, 1359 (2d Cir.1994). The court must initially determine whether the pre-trial identification procedures were unduly suggestive and if found to be so, whether the identification was nevertheless reliable under the totality of circumstances. See Manson v. Brathwaite, 432 U.S. 98, 112-14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Donnelly v. Raheem, 5, 122 S.Ct. 930, 151 L.Ed.2d 89234 U.S. 1118 (2002); U.S. v. Salameh, 152 F.3d 88, 126 (2d Cir.1998), cert. denied, 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999); Dunnigan v. Keane, 137 F.3d 117, 128-29 (2d Cir.1998), cert. denied, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998).
In finding the pre-trial identifications non-suggestive, the state hearing court found that the police were not required to investigate the other person tentatively identified from the photographic array (Suppression Minutes at 69). The court found that defendant appeared older in his photo than he did in court (Id. 69-70). As for the lineup, the court found the lineup photographs, which it reviewed, were, for the most part, adequate to discern that the fillers' physical features were "close to and somewhat identifiable with the defendant" (Id. 68-69). It found the detective's failure to record the fillers' heights and weights was not fatal to the procedure's reliability (Id. at 69-71).
In considering defendant's challenge to this ruling, this court must normally defer to the state court's subsidiary factual findings if fairly supported by the record, see 28 U.S.C.A. § 2254(d), and should give great weight to the considered conclusions of the state court, see Culombe v. Connecticut, 367 U.S. 568, 605, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). A review of both the hearing and trial testimony as well as the lineup photographs and photographic array demonstrate that the state hearing court's determination was correct and thus, entitled to deference pursuant to 28 § U.S.C. 2254(d).
Arguably defendant's current claims are without merit. For example, defendant's contention that defendant's photograph in the array was uniquely distinctive as an arrest photo, "which showed a criminal number or numbers across" his chest, is arguably belied by a review of the photographic array which shows that all six of the photos included in the array were arrest photos (Respondent's Exhibit I).
There was nothing in the hearing testimony to support defendant's claim that Detective Mullen induced Rodrique to choose defendant's photograph, after his tentative selection of photo number one, nor that Rodrique subsequently selected defendant from the lineup simply because he has seen him in the photo array (see Suppression Minutes at 6, 7, 29, 48; see also Trial Minutes at 78-79, 92-93, 95-96).
If defendant's hairstyle was particularly distinctive in the photo array this issue would arguably have had little probative force during the lineup procedure. This portion of defendant's hair appeared so far back on defendant's head it is possible that Rodrique would have been unable to see this particular feature during the lineup since, unlike with the photo array, Rodrique was never provided a side view of the lineup participants (Trial Minutes at 192-93; see Respondent's Exhibit I). Rodrique confirmed that he had identified *334 defendant in the lineup because he "recognized his face" (Trial Minutes at 96; see Suppression Minutes at 15) (emphasis added).
Arguably, even assuming, arguendo, that the photograph and lineup identifications were unduly suggestive, Rodrique Kelly's identifications were unduly suggestive, Rodrique Kelly's identification of defendant was nevertheless possessed independent reliability.
The Neil v. Biggers factors support a finding of reliability in this case. First, the eyewitness, Rodrique Kelly, had several good opportunities to view defendant, in the middle of a clear afternoon. There is nothing in the record to indicate precisely what description Rodrique provided the day of the crime other than that be told his son that the shooter had been wearing a green jacket (Trial Minutes at 138). This detail matched the victim's clothing description of the shooter, as well as what Pascal recalled defendant had been wearing earlier that day and what the person Pascal's father had followed after the shooting was wearing as well (Trial Minutes at 29, 45-46, 51, 114-15, 119-20, 128, 133-34, 144-45, 150).
At the photographic identification procedure, seven days later, Rodrique identified "mostly" number two, defendant's photograph, as the shooter but stated that the side view of the photo number one also "kind of" resembled the shooter as well (Trial Minutes 92-93, 226). Nevertheless, Rodrique explained that he would "definitely" know if he saw them in person (Suppression Minutes at 7, 29, 50; Trial Minutes at 92-93, 224-26). In fact, at the lineup, a few weeks later, Rodrique viewed the lineup for a "few seconds," and "[i]nstantly... noticed the gentleman that did the shooting," as number two, recognizing defendant's face (Trial Minutes at 67-69, 73, 80, 96).
In its order of June 10, 2003 this court wrote"
Petitioner, 16 years old at the time, was arrested at his home after allegedly robbing a mattress store and shooting the store's owner twice in the leg and three times in the groin and abdomen. At the station house, he was held for eight hours  he alleges without food  before making a statement in writing and later by videotape in which he acknowledged being at the crime scene but not having committed the crime. He was charged with attempted murder, assault, robbery, and criminal possession of a weapon.
At trial, two witnesses testified against him, one an eyewitness to the robbery. The eyewitness chose petitioner and one other suspect from a photo array as possibly the assailant. This eyewitness subsequently chose petitioner from a line up.
This case is troubling because there was a rather suggestive approach utilized by the police to achieve an eyewitness identification. It is plausible that petitioner was at the scene of the shooting but that he was just an "innocent bystander." Absent this eyewitness testimony a conviction was improbable. Nonetheless, there was sufficient evidence to sustain the verdict, and the writ should be denied. The petition is deemed amended to include a suggestibility claim.
XIV. Conclusion
The petition for a writ of habeas corpus is dismissed. A certificate of appealability is granted on this issue of lack of adequate identification.

D.
Defendant's claim that the trial court failed to conduct an adequate inquiry *335 into defendant's pro se motion to substitute trial counsel is barred from habeas review on an independent and adequate state procedural ground. In denying this claim in defendant's subsequent motion to vacate judgment, the state court explicitly held, pursuant to N.Y. Criminal Procedure Law § 440.10(2)©, that "[t]he issues raised herein, could have been raised on direct appeal but were unjustifiably not raised. Accordingly, the motion is procedurally barred, and the sought for relief is denied for reasons of procedural default." July 28, 2003, Decision at 3. Because this state court decision is based on a well-established state procedural default, and defendant has failed to show any cause and prejudice or a fundamental miscarriage of justice attendant to these claimed errors, this claim is precluded from review by this Court. See Coleman v. Thompson, 501 U.S. at 731-32, 111 S.Ct. 2546.
The state court's refusal to substitute counsel, based on defendant's original motion, did not abridge defendant's constitutional right to counsel. In determining whether the court's refusal to substitute counsel violated defendant's sixth amendment right, a reviewing court must consider: 1) whether the defendant made a timely motion for new counsel; 2) whether the trial court adequately inquired into the matter; 3) whether the conflict was so great as to result in a "total lack of communication preventing an adequate defense"; and 4) whether the defendant substantially and unjustifiably contributed to the breakdown of communications. U.S. v. John Doe # 1, 272 F.3d 116, 122-23 (2d Cir.2001) (citations omitted).
While defendant's pro se motion was timely since it was filed several months before trial, the court did not abuse its discretion by, allegedly, failing to make an adequate inquiry into defendant's allegations regarding counsel's representation.
The conclusory and ambiguous nature of defendant's own allegations against his legal aid attorney as well as the obvious effective representation that defendant received renders defendant's current claim sufficiently meritless so that no habeas relief is warranted. In his written pro se motion to substitute counsel, dated March 29, 1995, defendant alleged that counsel had improperly urged him to accept the People's plea offers, that counsel failed to visit him in his "place of confinement," failed to inform him of motions that counsel had made, failed to conduct any pretrial investigation, and had failed to make any bail requests (Defendant's Exhibit A, at 2, attached to Defendant's Motion to Amend and Supplement CPL 440.10 Motion, dated June 30, 2003).
There was nothing about these unspecified and ambiguous allegations, particularly brought at such an early stage of the proceedings, that rendered such claim sufficiently "substantial" to warrant a full inquiry by the court. The court was aware, at the time it received the motion, that counsel had already made, at least, two court appearances with defendant, where, at one, a plea had apparently been discussed (see Exhibit III). The court had also previously received defense counsel's fourteen-page omnibus motion where the court had, in response, granted several of the pre-trial hearings requested by counsel.
The court was also aware, at the time of the request for substitution, that counsel had previously proffered defendant's brother as a witness before the grand jury. Thus, under all these circumstances, the court could have reasonably surmised that counsel had, in fact, been both consulting with his client and had been reasonably engaging in some form of pre-trial investigation, and thus, reasonably rejected the facial credibility of defendant's conclusory *336 allegations in his motion, without the need for any further inquiry.
Even assuming, as defendant alleges, that there was "very little communication" between himself and counsel (Amendment to Petition, at B-2), this would not constitute a per se violation of defendant's right to counsel. Counsel proffered a reasonable misidentification defense by attempting to impeach the nature of the main witness' actual opportunity to view defendant.
Moreover, counsel also attempted to provide the jury with an alternate explanation for Rodrique and Pascal's identifications by suggesting, through defendant's own testimony, that both identification witnesses may have, in fact, seen defendant in the area but only after the crime. While this defense was ultimately unsuccessful the jury acquitted defendant of the top charge of attempted murder and the court sentenced defendant to less than the maximum allowed by law. Defendant was not provided with ineffective assistance. The court's refusal to substitute counsel did not constitute a federal constitutional violation.
This Court held an evidentiary hearing on the matter. It found trial counsel credible and competent in his defense of the petitioner.
This claim has no merit.

E.
Defendant argues that the trial court erroneously prevented him from calling Sidney Bernard, the victim of the stolen bicycle, as a defense witness as well as from cross-examining Arthur Cohen, the complainant in the instant case, regarding his prior alleged statement that he had recognized the shooter as someone who had robbed him in 1992 or 1993. These claims are rejected. First, both contentions are precluded from habeas review on an independent and adequate state procedural ground.
In denying these claims in defendant's motion to vacate judgment, the state court explicitly held, pursuant to N.Y. Criminal Procedure Law § 440.10(2)©, that "[t]he issues raised herein, could have been raised on direct appeal but were unjustifiably not raised. Accordingly, the motion is procedurally barred, and the sought for relief is denied for reasons of procedural default." July 28, 2003, Decision at 3. Because the state court's decision denying these particular claims was based on a well-established state procedural default, and defendant has failed to show any cause and prejudice or a fundamental miscarriage of justice attendant to these claimed error, this claim, like the other, is precluded from review by this Court. (See Coleman v. Thompson, 501 U.S. at 731-32, 111 S.Ct. 2546).
Second, both claims are belied by the record. According to the trial transcript, defendant never made a formal request to call the complainant, Sidney Bernard, in the unrelated bicycle robbery case (see Minutes of August 28, 1995, at 2-9). While the trial court initially suggested that such testimony might be collateral and irrelevant, the court never ultimately precluded the defense from calling the witness (see Id. at 7; Minutes of August 29, 1994, at 152-63). The court did allow the defense to explore the issue regarding the similarities of the two perpetrators' descriptions during Detective Martin Mullen's testimony (Minutes of August 29, 1995, at 207-16, 218-22). No constitutional violation occurred. See generally U.S. v. Almonte, 956 F.2d 27, 30 (2d Cir.1992) (a trial court may place restrictions on a defendant's presentation of evidence, so long as those restrictions serve "legitimate interests in the criminal trial process ... and are not `arbitrary or disproportionate' *337 to the purposes they are designed to serve." [citation omitted]).
Regarding defendant's contention that the court improperly limited defendant's cross-examination of Arthur Cohen the court did, in fact, allow the defense to question the victim regarding the prior statement (see Minutes of August 29, 1995, at 47-49). Considering that Mr. Cohen failed to identify defendant at all as the perpetrator, any alleged restriction of defense counsel's impeachment efforts related to the victim's identification testimony could not have unduly prejudiced the defense. See Brecht v. Abrahamson, 507 U.S. at 629, 113 S.Ct. 1710.
This claim has no merit.

F.
Defendant claims that the trial court improperly permitted the hearsay and bolstering testimony of the two eyewitnesses and the arresting officer (see Amendment to Petition at E-1 to E-3). In denying this claim in defendant's motion to vacate judgment, the state court explicitly held, pursuant to N.Y. Criminal Procedure Law § 440.10(2)©, that "[t]he issues raised herein, could have been raised on direct appeal but were unjustifiably not raised. Accordingly, the motion is procedurally barred, and the sought for relief is denied for reasons of procedural default." July 28, 2003, Decision at 3. Because the state court's decision denying this claim is based on a well-established state procedural default, and defendant has failed to show any cause and prejudice or a fundamental miscarriage of justice attendant to these claimed errors, this claim is precluded from review by this Court. (See Coleman v. Thompson, 501 U.S. at 731-32, 111 S.Ct. 2546).
Moreover, defendant's contentions lack merit. While erroneous admissions of out-of-court statements are potential violations of the Confrontation Clause, Idaho v. Wright, 497 U.S. 805, 816, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), there was no violation here. Defendant alleges that the state erroneously admitted, during Rodrique's and Pascal Kelly's testimony, the father and son's conversation shortly after the crime, in which Pascal told Rodrique that the man he had seen Rodrique following was Knowledge Dowtin, someone he knew from school. The first time the substance of this discussion was elicited at trial was on cross-examination by the defense.
During Rodrique's direct examination, the prosecution asked Rodrique if he had learned anything from the shooting. The court immediately interjected and stated, "Wait, Don't tell us what your son said" (Minutes of August 29, 1995, at 70). Nevertheless, during Rodrique's cross-examination defense counsel asked if the witness "had some conversation with your son regarding him knowing Mr. Dowtin from school" and if he had had the conversation prior to Rodrique's viewing of the photo array and lineup, and Rodrique replied that he had (Id. at 82). Defendant cannot complain now of any constitutional violation when portions of the evidence in question was first elicited by his own attorney. The People later elicited similar testimony from Pascal Kelly, during Pascal's direct examination, without any defense objection (see Id. at 122). Considering that the defense had already elicited the substance of this conversation during Rodrique's previous cross-examination, this testimony was not prejudicial. Part of the defense strategy was to argue that Rodrique had been unduly influenced to select defendant during the pre-trial identification procedures because of his son's prior familiarity with defendant. Any claim that defendant was denied a fair trial because of this evidence is unconvincing.
*338 Defendant's additional contention that the trial court improperly allowed the People to bolster Rodrique and Pascal's in-court identifications, in violation of N.Y. Criminal Procedure Law § 60.25, is rejected. As this court noted during the hearing, N.Y. Criminal Procedure Law § 60.25 is inapplicable to the present circumstances because both Pascal and Rodrique did make in-court identifications at trial (F.H. 43; see Minutes of August 29, 1995, at 60-61, 110). See also Preiser, Practice Commentaries, McKinney's Cons.Laws of N.Y., Book 11A, C.P.L. §§ 60.25; 60.30 (1992).
N.Y. Criminal Procedure Law § 60.30 explicitly permits witnesses who make in-court identifications to testify to their pretrial identifications. See Preiser, Practice Commentaries, McKinney's Cons.Laws of N.Y., Book 11A, C.P.L. § 60.30 (1992). There was no abridgement of defendant's constitutional rights because there was no violation of state evidentiary law or general constitutional confrontation rights. To the extent there were any bolstering violations at all, none of these alleged evidentiary errors were so pervasive as to have denied defendant a fundamentally fair trial.

G.
Defendant contends that the People knowingly proffered perjured testimony when they elicited Pascal Kelly's testimony stating that he had taken art and math classes with defendant (Amendment to Petition at F-1 to F-6). Defendant's claim is meritless. A prosecutor cannot stand by while a witness testifies falsely, but, defendant offers no convincing evidence that the People ever had in their possession any information confirming that Pascal Kelly committed perjury when he testified that he had taken art and math classes with defendant at South Shore High School.
Defendant's sole offer of proof to the state court as well as to this Court remains his own uncertified high school record. This evidence is inadequate. Even if such proof were viewed as reliable without comparing Pascal Kelly's own certified school records, there would be no way to establish which classes Pascal, in fact, took during the 1993-1994 school years. Accordingly, the state court's rejection of this claim, pursuant to N.Y. Criminal Procedure Law § 440.30(1), "because defendant offers no sworn allegations in support thereof" (July 28, 2003, Decision at 4), was neither contrary nor an unreasonable application of Supreme Court law and should, thus, be upheld. See 28 U.S.C. § 2254(d).
Nevertheless, even on its face, defendant's own school record failed to lend support to defendant's allegations that Pascal's testimony was false. According to Pascal's and defendant's trial testimony, that two were no more than a year apart in age (Trial Minutes at 108, 233). While Pascal testified in August 1995, that he was in ninth grade (which, presumably, meant that he was about to go into tenth grade), he candidly admitted that he did not know if defendant had been in his grade. Rather, he stated only that he knew that between 1993 and 1994 they had taken math and art classes together, once a week, even recalling the art teacher's name (Id. at 108-090, 142).
There were several potential explanations to support the credibility of Pascal's testimony that the two had taken are and math together or, at least, to demonstrate that the witness was not intentionally lying. First, because of their closeness in age, both defendant and Pascal may have, indeed, been in the same grade. Second, even if not, one or both of them may have had to repeat certain courses but not others. Third, students from different grades *339 are often assigned the particular subjects of math and art together. Finally, Pascal, who was only sixteen years old when he testified at trial, may be simply confused the years the two were in class together.
The most probative evidence establishing the reliability of Pascal's identification of defendant was that he had seen defendant almost every day in the school's hallways as well as at the Burger King at Church Avenue and Remsen Avenue (Minutes of August 29, 1995, at 109-10, 128). In addition, Pascal also testified that he knew defendant's unique first name  "Knowledge"  and had provided that name to his father after the shooting, who apparently then told the police (Trial Minutes at 109-11, 122, 207).
Defendant never directly denied any of Pascal's contentions during his own trial testimony, including the fact that the two had taken some classes together at South Shore High School. Defendant even conceded that he "probably" had seen Pascal before because they attended the same school (Trial Minutes at 235, 274).
This claim has no merit.

H.
Defendant's contentions that he was deprived of effective assistance of counsel because trial counsel failed to object to his claimed trial errors, including the trial court's alleged refusal to allow defendant to call a witness, the court's alleged admission of hearsay and bolstering testimony, the People's presentation of, allegedly, legally insufficient evidence, the alleged improper use of defendant's arrest photo at trial, and the court's refusal to provide the jury with defendant's grand jury testimony pursuant to the jurors' request, are all barred from this court's review on an independent and adequate state procedural ground.
In its summary denial of the motion, the trial court ruled that all of these claims were statutorily barred pursuant to N.Y. Criminal Procedure Law § 440.10(2)©. See July 28, 2003, Decision and Order at 3. Because the grounds in support of defendant's ineffective assistance of counsel claim were all based on facts that appeared on the record, and defendant has failed to show any cause and prejudice or a fundamental miscarriage of justice attendant to these claimed errors, they are precluded from federal review on this independent and adequate state procedural ground. See Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir.2003) (N.Y. Criminal Procedure Law § 440.10(2)© acts as independent and adequate state ground barring federal habeas review of ineffective assistance of counsel claim where basis of Sixth Amendment issue involves alleged errors well established in trial record). See generally Coleman v. Thompson, 501 U.S. at 731-32, 111 S.Ct. 2546.
Defendant's complaint that counsel was ineffective for failing to object to the above alleged errors is without merit. Under the Federal Constitution, a defendant is entitled to "reasonably effective assistance," which, in light of all the circumstances, does not fall "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 687, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Nevertheless, counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. Id. at 689, 104 S.Ct. 2052; U.S. v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
To succeed on a claim of ineffectiveness of counsel, a defendant has to demonstrate: 1) "that counsel's representation fell below an objective standard of reasonableness," and 2) "that there [was] a reasonable possibility that, but for counsel's *340 unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Defendant has failed to meet this standard.
In the instant case, defendant contends that trial counsel should have offered specific objections to the trial court's alleged refusal to allow defendant to call Sidney Bernard as a witness, the court's alleged admission of hearsay and bolstering testimony regarding Rodrique and Pascal Kelly's identifications, as well as to the People's presentation of legally insufficient evidence regarding identification. None of these claims have any merit. Accordingly, any alleged failure to object did not evidence defendant's receipt of ineffective assistance of counsel. See U.S. v. De La Pava, 268 F.3d 157, 163 (2d Cir.2001) (if underlying claim meritless counsel not ineffective); see also Hinkle v. Randle, 271 F.3d 239 (6th Cir.2001) (failure to object not prejudicial if objection would not have been sustained). As counsel testified before this court, and as the trial record demonstrates, trial counsel had been more than willing to make "appropriate" objections on numerous occasions at trial so long as it did not tend to alienate the jury.
As for defendant's claim regarding the use of his arrest photo, counsel testified at the hearing in this court that he had sought to admit the photo array into evidence, during Rodrique Kelly's cross-examination, to demonstrate its suggestiveness in that it was the only photo in the array that showed defendant's distinctive hairstyle (F.H. 17; see Trial Minutes at 73-74). During counsel's questioning of the witness, defense counsel specifically utilized the array to impeach the reliability of Rodrique's entire identification. Counsel highlighted that Rodrique had also identified a second participant in the array but that only defendant and not this particular filler was then placed in the subsequent lineup that Rodrique viewed. Moreover, counsel was further able to argue the alleged suggestiveness of the police identification procedures by focusing on the fact that defendant's numbered position was, notably, the same in both the array and lineup (see Trial Minutes at 78-81).
While defendant takes issue with the fact that counsel chose to admit a potentially prejudicial arrest photo into evidence for these purposes, this was apparently a strategic decision on trial counsel's part and "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Counsel made a reasonable effort to limit any potential prejudice by attempting to insure both that the prosecutor would not refer to defendant's photo as one from a prior arrest and that the numbers on the photo would be redacted before the jury would have an opportunity to review the photograph closely during deliberations, but the court refused (Trial Minutes at 163-75, 230; see 290-91; F.H. 18). After defense counsel accused the prosecutor of implying to the jurors, during Detective Mullin's direct examination, that the array, indeed, contained arrest photos counsel moved for a mistrial or, in the alternative, again asked for redaction but was, once again, refused (Trial Minutes at 230, 290-91). Defense counsel's efforts constituted effective assistance.
Defendant's additional contention that counsel was ineffective in failing to object to the court's refusal to provide the jury with defendant's grand jury testimony also lacks merit. While counsel did make an attempt to have the court respond to the jury's note by having as much of the relevant grand jury testimony read back to them as possible, counsel reasonably understood *341 that the court could not provide the jury with defendant's entire grand jury testimony because if was not in evidence (Trial Minutes at 371-73; see F.H. 18-19). Defense counsel did persuade the court, however, to have the jurors submit an alternative request in writing, without any inquiry, that ultimately resulted in the readback of defendant's entire trial testimony (Trial Minutes at 373-75).
Defendant also makes several other allegations that relate to counsel's alleged failure to investigate as well as his failure to request a pre-trial hearing to determine Pascal Kelly's familiarity with defendant. In denying the latter contention, the state court correctly held that, under New York law, no hearing, pursuant to People v. Rodriguez, 79 N.Y.2d 445, 583 N.Y.S.2d 814, 593 N.E.2d 268 (1992), was required to determine whether Pascal Kelly's identification was confirmatory, because a Wade hearing had been conducted.
In addressing defendant's additional contentions that counsel failed to investigate defendant's brother, Justice Dowtin, and friend, Anthony Sanford, as alibi witnesses, or measure the distance between Pascal Kelly's home and the auto body shop to confirm Pascal Kelly's presence near the scene at the time of the shooting, and, finally, to obtain the videotape from the Burger King's surveillance camera, the state court ruled that all of these contentions should be rejected, pursuant to N.Y. Criminal Procedure Law § 440.30(4)(d)(I), (ii), because defendant failed to provide sufficient sworn allegations in support of them (July 28, 2003, at 3-4).
Defendant never provided any sworn affidavits from either his brother or Anthony Sanford in support of an alibi defense. Defendant never offered any sworn evidence, other than his own allegations, that, based on Pascal's actual home address, the witness's testimony that he was able to ride home on his bicycle and then return to the body shop in time to hear the shooting was implausible. Finally, defendant failed to offer any sworn allegations  other than his own speculative assumptions  that the alleged Burger King cameras had, in fact, captured defendant's alibi or impeach the People's witnesses' testimony regarding defendant's clothing and hairstyle on the day of the crime. Thus, the state court's decision to reject these claims are also entitled to deference.
The testimony in this court as well as the record in the state court amply supports the conclusion that defense counsel did a more than adequate job. The evidence against defendant was just impossible to overcome.
This claim has no merit.

I.
Petitioner moved for a stay of state proceedings, 28 U.S.C. § 2251. No proceedings are pending. The stay is denied.

J.
No other possible claim has any merit.
This habeas corpus application is an important matter to petitioner. The court has considered all of his claims. Those claims not discussed in this memorandum are frivolous.
XV. Conclusion
The petition for a writ of habeas corpus is denied.
A certificate of appealability is granted with respect to lack of adequate identification. Petitioner has made no other substantial showing of the possible denial of a constitutional right. He may, as already indicated, seek a further certificate of appealability *342 from the Court of Appeals for the Second Circuit.
SO ORDERED.